IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:21-CV-126-FL

| | | |
|---|---|---|
| CLEMMONS FARMING, INC.; JODY E. CLEMMONS; and LAUREN B. CLEMMONS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| SILVEUS SOUTHEAST, LLC and JAMES M. CARROLL, JR., | ) ) ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion for summary judgment (DE 32), plaintiffs' motion for summary judgment (DE 38), defendants' motion to exclude Clifton R. Parker ("Parker") as an expert (DE 36), and defendants' motion to seal (DE 55). The motions have been fully briefed and the issues raised are ripe for ruling. For the following reasons, defendants' motion to seal is granted, and each other motion is granted in part and denied in part as set forth herein.

## STATEMENT OF THE CASE

Plaintiffs commenced this action against defendants June 8, 2021 in Brunswick County Superior Court arising out of a crop insurance claim. Plaintiffs assert claims against defendant James M. Carroll, Jr. ("Carroll") for breach of fiduciary duty, constructive fraud, and negligence; against defendant Silveus Southeast LLC ("Silveus") for negligence and respondeat superior; and against both defendants for unfair and deceptive trade practices under N.C.G.S. §§ 58-63-15(1), 75-1.1 ("UDTP"). Defendants removed the action to this court July 12, 2021.

Following a period of discovery, the parties filed the instant motions for summary judgment. Defendants rely on 1) deposition testimony of plaintiff Jody E. Clemmons ("Clemmons"); defendant Carroll; and Jeffrey Vanlandingham ("VanLandingham"), the regional vice president of Producers Agriculture Insurance Company ("ProAg"); 2) an arbitration order; 3) documents concerning the operations of plaintiffs' farm, comprising an operations report and financial statements; and 4) expert report and deposition testimony of Clifton R. Parker ("Parker").

Plaintiffs rely upon 1) defendants' answer; 2) the parties' depositions and affidavits; 3) various third parties' depositions; 4) an arbitration award; 5) defendants' discovery responses; 6) numerous documents related to the insurance policy at issue in this case; 7) communications from plaintiffs' financial institution; 8) correspondence from ProAg; and 9) Parker's deposition and report.

Defendants subsequently moved to exclude Parker as an expert. Defendants rely upon Parker's deposition and report, while plaintiffs rely upon these materials and Parker's affidavit.

## STATEMENT OF FACTS

Plaintiff Clemmons Farming, Inc. ("Clemmons Farming") is a North Carolina corporation with a principal place of business located in Brunswick County. (Statement of Material Undisputed Facts by Pls. (DE 40) ¶ 1 ("Pls' SMF")). Defendant Silveus is an Indiana limited liability company which sells crop insurance in North Carolina. Defendant Carroll worked for Silveus as an insurance agent. (Id. ¶ 2).

The United States Department of Agriculture ("USDA") closely supervises the farm insurance industry. (Id. ¶ 5). Beginning in 2015, Congress and the USDA approved a new insurance product, Whole Farm Revenue Protection ("WFRP"), (id. ¶ 12), which provides coverage against loss of expected revenue from commodities produced during the insurance period

1

under a single policy. (Id. ¶ 7). WFRP insures all products grown on a farm, which differs from traditional crop insurance. (Id. ¶ 13). A farmer's expected revenue, which determines coverage, is set as the lower figure produced by two different formulas. (Id. ¶¶ 8, 14). Under the first formula, a farmer calculates his or her average revenue over the previous five years using tax records (hereinafter "historical average"). (See id.). Under the second formula, a farmer submits projected crop yields, prices, and acreages for his or her various products to arrive at a projected future revenue (hereinafter "expected revenue"). (See id.).

Before 2017, plaintiff Clemmons Farming had no experience with WFRP, and had never carried a WFRP policy. (Id. ¶ 10). In February 2017, plaintiff Jody Clemmons, the president of Clemmons Farming, attended a "farm peer-group meeting" in Rocky Mount, North Carolina, convened primarily to discuss WFRP. (Id. ¶ 11). At the meeting, Clemmons spoke to Carroll, another Silveus agent ("Tillman"), and VanLandingham, a representative of ProAg, which is an insurance company offering crop insurance policies. (Id. ¶ 12). At the meeting, Carroll, Tillman, and VanLandingham all held themselves out as knowledgeable about WFRP policies. (Id. ¶ 18; Defs' Resp. Pls' Statement of Material Facts (DE 47) ¶ 18 ("Resp. Pls' SMF")). Based on this meeting, Clemmons Farming decided to obtain a WFRP policy from Silveus; Carroll and Tillman generated a ProAg WFRP application covering Clemmons Farming's soybean, corn, and tobacco crops on February 28, 2017. (Pls' SMF ¶ 20). Carroll represented to Clemmons that he would submit supporting documentation alongside the application to ProAg. (See id. ¶ 21). Carroll, Tillman, and Clemmons completed and executed the application the same day. (See id. ¶¶ 22–23).

Clemmons Farming's expected revenue documented in this application was $1,993,313.00, while its historical average was $1,571,071.00 (See id. ¶¶ 33, 44). Because the latter figure was

2

lower, it governed coverage amount.  (See id. ¶ 8).  In turn, the policy had an 80% coverage level, meaning that ProAg would cover up to 80% of the lower figure; this calculation resulted in a coverage amount of $1,256,857.00.  (See id. ¶ 45).

The parties dispute numerous aspects of what information Carroll should have submitted to ProAg alongside the application, what information he actually submitted, and various actions by third parties with implications for these questions.  (See id. ¶¶ 24–31; Resp. Pls' SMF ¶¶ 24, 27–33).

Broadly, plaintiffs contend that the WFRP handbook from the USDA (the "handbook") requires an insurance agency to calculate coverage figures using yield data from a farm's historical yields, and price data from the USDA's Risk Management Agency ("RMA").  (Pls' SMF ¶ 24).  Defendants argue that neither assertion is correct.  (See Resp. Pls' SMF ¶ 24).  Plaintiffs further contend that Carroll improperly failed to submit Clemmons Farming's historical yield data (Pls' SMF ¶ 28–29), while defendants argue that this data was not required, and also that Carroll requested it but Clemmons Farming failed to provide it.  (See Resp. Pls' SMF ¶ 28–29).  Finally, plaintiffs contend that Carroll improperly bypassed Silveus's normal internal review processes (see Pls' SMF ¶¶ 30–31, 54–56); defendants assert that this course of action was proper, because Carroll filled out the WFRP application with, and relying on, VanLandingham, a ProAg executive.  (See Resp. Pls' SMF ¶¶ 30–31, 54–56).

Following the meeting and application execution, Clemmons Farming entered into a loan with Cape Fear Farm Credit ("CFFC"), which required crop insurance as a loan term ("Loan 44").  (See Pls' SMF ¶ 37; Pls' App. Statement of Material Facts (DE 41) ("Pls' App. SMF") Ex. L (DE

3

41-12) ("March Loan Letter") 2, 5).[1]  Loan 44 pledged as collateral all of Clemmons Farming's assets, as well as real and personal property owned by plaintiffs Clemmons and Lauren B. Clemmons, including their primary residence.  (Pls' SMF ¶ 39).

In 2018, Clemmons Farming submitted a claim under the policy for a revenue loss of $304,306.00 sustained during the 2017 crop year.  (Id. ¶¶ 40–41).  ProAg submitted a response on June 13, 2018, stating that ProAg had adjusted the coverage figure because ProAg believed the data used to determine expected revenue was not "justified, reasonable, and documented."  (Pls' SMF ¶ 42; Pls' App. SMF Ex. L (DE 41-14) ("ProAg Letter") 3).  Specifically, ProAg disputed the projected yields of all three crops, and the projected price of corn.  (See Pls' SMF ¶ 42; Resp. Pls' SMF ¶ 42; ProAg Letter 3).  On this basis, ProAg revised Clemmons Farming's Expected Revenue downwards to $1,286,970.00.  (Pls' SMF ¶ 44).

This adjustment made expected revenue lower than historical average, and therefore the figure governing coverage amount.  (See id. ¶¶ 8, 44).  Under the policy's 80% coverage level, Clemmons Farming's coverage figure therefore dropped from $1,256,857.00 to $1,029,576.00.  (Id. ¶ 45).  After this reduction and based on its claimed loss, Clemmons Farming received an indemnity of $77,568.00.  (Id.).  Clemmons Farming did not receive the revised coverage figure until after it made the 2018 claim, which occurred after it took out the loans requiring crop insurance.  (See id. ¶ 47).  In 2019, CFFC declared Clemmons Farming in default of Loan 44 and declared its intent to foreclose on the collateral specified in the loan.  (Id. ¶ 52).  Plaintiffs now argue that defendant Carroll improperly submitted the application to ProAg, causing plaintiffs to believe they had greater coverage than they did.

---

[1]    Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

Clemmons Farming commenced an arbitration proceeding against ProAg, and a hearing occurred on January 20, 2020. (Id. ¶ 48). The arbitrator concluded that while some downward adjustments on prices and yields were warranted, ProAg's numbers were too low. (See generally App. Statement of Material Facts ("Defs' App. SFM") (DE 34) Ex. 3 (DE 34-3) ("Arbitration Order")). The arbitrator therefore arrived at a third set of figures between the numbers defendant Carroll submitted and ProAg's downwardly adjusted figures, and ordered the parties to calculate Clemmons Farming's claim using these numbers. (See Arbitration Order 11). The arbitrator thus awarded Clemmons Farming an additional indemnity payment of $95,660.00, which Clemmons Farming paid towards the balance of Loan 44. (Id. ¶¶ 48–49).

## COURT'S DISCUSSION

A.    Cross-Motions for Summary Judgment

1.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute

5

is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient

evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's]

favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary

judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached

exhibits, and depositions] must be viewed in the light most favorable to the party opposing the

motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable

probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the

necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace

v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law

is warranted where "the verdict in favor of the non-moving party would necessarily be based on

speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir.

2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable

inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at

489-90.

2.      Analysis

a.      Proximate Cause

Defendants argue as a threshold matter that plaintiffs cannot demonstrate proximate cause between any of defendants' actions and plaintiffs' injuries, which defeats all of plaintiffs' claims as a matter of law.  The court disagrees.

Under North Carolina law, each of plaintiff's claims includes an element of proximate cause.  See Chisum v. Campagna, 376 N.C. 680, 724 (2021) (breach of fiduciary duty and constructive fraud); Stein v. Asheville City Bd. of Educ., 360 N.C. 263, 267 (2006) (negligence); Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68 (2000) (UDTP).

> Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 233 (1984).

Thus, a plaintiff must demonstrate that a "defendant might have foreseen that some injury would result from his act or omission."  Id. at 234.  Further, "without doubt" there can be more than one proximate cause to an injury; "accordingly, where several causes combined to produce injuries, a person is not relieved from liability because he is responsible for only one of them." Price v. Gray, 246 N.C. 162, 166 (1957).  "In order to . . . supersed[e] prior negligence, the new independent, intervening cause must be . . . adequate to bring about the injurious event."  Riddle v. Artis, 243 N.C. 668, 671 (1956) (emphasis added).

Thus:

> An efficient intervening cause is . . . an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains

7

active, the liability for its result is not shifted. Thus, where a horse is left unhitched in the street and unattended, and is maliciously frightened by a stranger and runs away: but for the intervening act, he would not have run away and the injury would not have occurred; yet it was the negligence of the driver in the first instance which made the runaway possible. This negligence has not been superseded nor obliterated, and the driver is responsible for the injuries resulting. If, however, the intervening responsible cause be of such a nature that it would be unreasonable to expect a prudent man to anticipate its happening, he will not be responsible for damage resulting solely from the intervention.

Hairston, 310 N.C. at 236–37 (quoting Harton v. Telephone Co., 141 N.C. 455, 462–63 (1906)).

Finally, "[o]nly when the facts are all admitted and only one inference may be drawn from them will the court declare whether an act was the proximate cause of an injury or not." Adams v. Mills, 312 N.C. 181, 193 (1984). "[B]ecause that is rarely the case . . . proximate cause . . . is ordinarily a question for the jury." Id.

Defendants advance two proximate cause arguments against all of plaintiffs' claims. Defendants contend that two events constituted unforeseeable acts of a third party: ProAg's decision to reduce the policy's coverage figure, and plaintiffs' decision to cut acreage under cultivation. The court examines each in turn.

i.      ProAg's Decision

Based upon undisputed evidence in the record, ProAg's decision to reduce coverage was foreseeable to defendant Carroll and therefore not an intervening cause that severed proximate cause between Carroll's conduct and plaintiff's injury. Carroll admits in his deposition that he knew ProAg could reduce or deny coverage if information used to determine expected revenue is incorrect or undocumented. (See Pls' App. SMF Ex. B ("Carroll Deposition") 101:1–16). Thus, if a jury decides that Carroll wrongfully submitted incorrect information to ProAg, it could also find that ProAg's decision to reduce coverage is not a superseding cause. See Hairston, 310 N.C. at 236–37 ("yet it was the negligence of the [first actor] which made the [injury] possible").

8

Defendants rely upon Harris v. State Farm Fire and Cas. Co., No. 5:13-CV-61-BO, 2013 WL 3356582 (E.D.N.C. July 3, 2013), to argue that an insurer's actions are always beyond the control of an individual agent and therefore unforeseeable as a matter of law. (See Defs' Mem. Supp. Mot. Summ. J. (DE 35) ("Defs' Br. Supp.") 14). But Harris rested on distinguishable facts. In Harris and both cases upon which Harris relies, the insurance agent had undisputedly fulfilled all duties to the plaintiff, or his individual actions were entirely unrelated to the claims presented. See Harris, 2013 WL 3356583, at *2–3; Selvaggi v. Prudential Prop. and Cas. Ins. Co., 871 F. Supp. 815, 819 (E.D. Pa. 1995); Newman ex rel. Poston v. Bankers Life and Cas. Co., No. 2:10-CV-02135-DCN, 2010 WL 4638566, at *3 (D.S.C. Nov. 8, 2010). In contrast, Carroll's fulfillment of his duties is mired in factual dispute. Among other matters, the parties dispute what information Carroll submitted to ProAg, and what information he should have submitted. (See generally Pls' SMF ¶¶ 22–31; Resp. Pls' SMF ¶¶ 22–31). Thus, ProAg's actions cannot overcome the ordinary rule that proximate cause is a jury question. See Mills, 312 N.C. at 193.

### ii. Plaintiffs' Decision to Cut Acreage

Defendants also argue that plaintiffs' decision to reduce acreage under cultivation is an independent event that severs proximate cause between Carroll and plaintiffs' injuries. (See Defs' Br. Supp. 6–8). As noted above, an event can have more than one proximate cause, "without doubt." See Price, 246 N.C. at 166. And a new cause must be "adequate to bring about the [injury][.]" Riddle, 243 N.C. at 671. Plaintiff's decision to reduce acreage, however, was not "adequate" to bring about the injury in itself.

Plaintiffs' reduction in acreage, using the figures defendants submitted, resulted in an expected revenue of $1,622,355.44, which left the historic average as the governing figure. Plaintiffs' original cultivation area, using the prices and yields ultimately found by the arbitrator,

would have resulted in an expected revenue of $1,725,525.00, which also would have left historic average as governing coverage.[2] But using both reduced acreage and the arbitrator's figures results in an expected revenue of $1,408,740.45.[3] Thus, neither the cut in acreage nor the arbitrator's ultimate reduction in prices and yields would have lowered expected revenue below historic average, and thus reduced plaintiffs' coverage alone; instead, the two actions together produced the injury. "If the intervening cause is in reality only a condition on or through which the negligence of the defendant operates to produce an [injury], it does not break the line of causation[.]" Riggs v. Akers Motor Lines, 233 N.C. 160, 165 (1951) (emphasis added). Plaintiffs' decision to reduce acreage was not "adequate" to produce the injury by itself, Riddle, 243 N.C. at 671, but rather a "condition on . . . which" defendants' actions operated to produce an injury. Riggs, 233 N.C. at 165.

Finally, defendants argue that Clemmons's decision to cut acreage was contributorily negligent. However, defendants advance these arguments cursorily, and numerous issues of fact on applicable duties and breaches thereof preclude entry of judgment as a matter of law on contributory negligence. Defendants' conclusory assertion that this decision was contributorily negligent does not meet defendants' burden to establish entitlement to judgment as a matter of law. (See, e.g., Defs' Mem. Opp'n Pls' Mot. Summ. J. (DE 46) ("Defs' Br. Opp'n") 16–17).

The court therefore rejects defendants' overarching proximate cause arguments as a basis for summary judgment, and concludes that plaintiffs have presented sufficient evidence to

---

[2]     Using the arbitrator's price and yield figures and plaintiffs' reduced acreage results in an expected revenue of $1,053,900.00 for tobacco, $397,575.000 for corn, and $274,050.00 for soybeans, which total $1,725,525.00. (See Arbitration Order 11 (adjusted prices and yields); Pls' App. SMF Ex. O (DE 41-15) ("RFOR") (reduced acreage figures)).

[3]     1) Tobacco: 2,342 pounds/acre * $2/pound * 199.76 acres = $ 935,675.84,
        2) Corn: 114 bushels/acre * $4.65/bushel * 501.37 acres = $265,776.24,
        3) Soybeans: 29 bushels/acre * $10.50/bushel * 680.75 acres = $ 207,288.37,
        4) **Total**: $1,408,740.45. (See Arbitration Order 11 (prices and yields); RFOR (acreage)).

demonstrate a genuine issue of fact for trial on this issue. Proximate cause on all claims is a jury question. With this determination in mind, the court turns to examine each of plaintiffs' claims in sequence.

        b.      Substantive Claims

             i.      Breach of Fiduciary Duty

Defendants argue that no genuine issue of material fact exists that defendant Carroll breached neither 1) a basic fiduciary duty owed by all insurance agents, nor 2) an implied duty to advise assumed through the parties' course of dealing, nor 3) a de facto fiduciary relationship. The court disagrees only with the first contention, and then only to the extent necessary to present the question to a jury.

North Carolina law recognizes two types of fiduciary relationship: de jure and de facto. De jure relationships exist by operation of law, while de facto relationships arise from particular facts and circumstances. See Azure Dolphin, LLC v. Barton, 371 N.C. 579, 593 (2018) (discussing de jure and de facto relationships); Hager v. Smithfield E. Health Holdings, LLC, 264 N.C. App. 350, 355 (2019).

A North Carolina insurance agent is subject to two possible de jure relationships. First, all insurance agents have a "limited fiduciary duty" to correctly name the insured in a policy, and to correctly advise the insured of the nature and extent of coverage. Cobb v. Pa. Life Ins. Co., 215 N.C. App. 268, 275 (2011).[4] Second, an agent may have a more general duty to affirmatively advise an insured if 1) the agent receives consideration beyond payment of the premium; 2) the

---

[4]      The Supreme Court of North Carolina has not weighed in on this issue, but the North Carolina Court of Appeals has relied upon Cobb in the following years. See Country Cafaye, Inc. v. Travelers Cas. Ins. Co. of Am., No. COA 14-226, 2014 WL 4557533, at *5 (N.C. Ct. App. Sept. 16, 2014); Rayfield Props., LLC v. Bus. Ins. of Carolinas, Inc., No. COA12-791, 2012 WL 6595558, at *3 (N.C. Ct. App. Dec. 18, 2012); see also IDS Prop. Cas. Ins. Co. v. Lu, No. 5:15-CV-561-BO, 2016 WL 1532235, at *4 (E.D.N.C. Apr. 15, 2016).

insured makes a clear request for advice; or 3) an extended course of dealings between the parties would put an objectively reasonable insurance agent on notice that his or her advice is being sought and relied upon.  Bigger v. Vista Sales & Mktg., Inc., 131 N.C. App. 101, 104 (1998).

 By contrast, a de facto relationship arises "where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Abbitt v. Gregory, 160 S.E. 896, 906 (N.C. 1931). This test is "intentionally amorphous," but nonetheless "demanding[.]" Hager, 264 N.C. App. at 356.  Only when one party "holds all the cards – all the financial power or technical information, for example – have North Carolina courts found a [de facto fiduciary relationship][.]" Lockerman v. S. River Elec. Membership Corp., 250 N.C. App. 631, 637 (2016).

Plaintiffs argue that there is a genuine issue of fact that a fiduciary relationship existed under all three formulations.  (See Pls' Resp. Opp'n Defs' Mot. Summ. J. (DE 49) ("Pls' Br. Opp'n") 8–12).[5]

First, the court turns to the "limited" duty imposed on all insurance agents.  All insurance agents have a duty to correctly name the insured in the policy, and to correctly advise the insured about the nature and extent of the insured's coverage.  Cobb, 215 N.C. App. at 274.  Plaintiffs do not argue that Carroll named the wrong insured, but rather that he failed to correctly advise Clemmons Farming about the extent of coverage.  The record reflects that Carroll used the subsequently reduced figures in the application he and Clemmons filled out together, (see Pls' App. SMF Ex. G (DE 41-7) 4), and silence on any other or subsequent possible misrepresentations by Carroll.

---

[5]     Plaintiffs' brief appears to blend the standards for the de jure implied duty to advise, and a de facto relationship.  (See Pls' Br. Opp'n 9–11)  Out of an abundance of caution, the court addresses possible relationships under all three standards.

But the policy application is just that: an application, not a policy itself. And crucially, defendants have produced no evidence that Carroll ever advised plaintiffs on the extent of coverage on the policy once issued. Defendants argue that an insured has a duty to review a policy document once issued, so that a fiduciary duty claim against an agent cannot stand if the insured fails to do so. However, Clemmons testified at his deposition that defendants never gave him a copy of the template policy that explained how WFRP policies functioned, (see Pls' App. SMF Ex. C (DE 41-3) ("Clemmons Deposition") 73:1–17), and the record is silent on whether defendants ever provided a written copy of the policy here to plaintiffs. Defendants state that this information was available on the USDA website, but cite no record evidence to support this assertion. (See Defs' Reply Pls' Opp'n Defs' Mot. Summ. J. (DE 51) ("Defs' Reply Br.") 5). Plaintiffs have thus presented sufficient evidence of a breach of this duty to survive summary judgment. However, breach of fiduciary duty also requires a causative chain between breach and injury, and so the court's conclusion above that a jury must decide proximate cause in this case precludes entry of summary judgment on this theory in favor of either side.

Second, a de jure duty to advise an insured may arise if an agent receives consideration beyond payment of a premium, the insured makes a clear request for advice, or an extended course of dealing would have put a reasonable agent on notice that his or her advice was being relied upon. Bigger, 131 N.C. App. at 104. Plaintiffs make no argument based on the extra consideration prong. Plaintiffs further produce no argument or evidence, in their complaint, statement of material facts, or elsewhere in the record, that plaintiffs ever made a "clear request for advice" from Carroll. (See generally Compl.; Pls' SMF).

Plaintiffs also fail to demonstrate a genuine issue of fact that an extended course of dealing existed. Clemmons met with Carroll three times, including the meeting at which the two men

filled out the application. (See Clemmons Dep. 71:6–14). However, Cobb held that three meetings, including one at which the agent proposed a policy and the parties filled out an application, did not establish an extended course of dealing. See Cobb, 215 N.C. App. at 275. In addition and in the alternative, plaintiffs produce no evidence of conduct or communications that would have put an objectively reasonable agent on notice that his or her advice was relied upon. Plaintiffs instead argue that Clemmons was unfamiliar with WFRP policies, and in fact relied upon Carroll. (See Pls' SMF ¶¶ 10, 19). But Clemmons's own experience and internal decision-making processes would not place an objectively reasonable agent on notice of anything if not communicated. And plaintiffs present no evidence that Clemmons's thoughts were so communicated. The court therefore concludes that plaintiffs' fiduciary duty claim under this theory does not survive defendants' motion, and defendants are entitled to summary judgment on this issue, under this theory.

Third, plaintiffs fail to establish a de facto fiduciary relationship, for many of the same reasons discussed above with reference to the duty to advise. The North Carolina courts have consistently emphasized that the standard for a de facto fiduciary relationship is "demanding[.]" Lockerman, 250 N.C. App. at 636. Further, "general contractual relationships do not typically rise to the level of fiduciary relationships." Sykes v. Health Network Sols., Inc., 372 N.C. 326, 340 (2019). A de facto fiduciary relationship will not arise "absent the existence of dominion and control by one party over another." Kaplan v. O.K. Techs, LLC, 196 N.C. App. 469, 474 (2009).

As with their duty to advise theory, plaintiffs have not demonstrated a genuine issue of fact or circumstances that could give rise to a de facto fiduciary relationship. Plaintiffs effectively allege a mere arms-length transaction; the North Carolina courts have rejected de facto duty claims premised on dynamics involving greater degrees of influence than here, and have required

extraordinary circumstances to conclude that a de facto relationship existed. See, e.g., Dalton v. Camp, 353 N.C. 647, 651–52 (2001) (trust and confidence inherent in employer-employee relationship did not create fiduciary duties); McNew v. Fletcher Hosp., Inc., 2022 NCBC 53, at *4–5 (N.C. Bus. Ct. 2022) (hospital administrators did not owe de facto duties in billing to emergency head injury patient); cf. Curl ex rel. Curl v. Key, 311 N.C. 259, 262–64 (1984) (holding that grieving minor siblings were owed fiduciary duties by family friend whom they had trusted their entire lives and who tricked them into signing away their home under false pretenses); Can-Dev, ULC v. SSTI Centennial, LLC, 2018 NCBC 9, at *6–7 (N.C. Bus. Ct. 2018) (LLC member owed de facto duties to another member once he took over all the LLC's projects, excluded plaintiff from any influence or even information over or about business, and LLC agreement provided no recourse). Plaintiffs' de facto fiduciary duty claim therefore also does not survive defendants' motion, and defendants are entitled to summary judgment on this issue, under this theory.

In sum, plaintiffs have failed to present evidence of a de jure duty to advise or of a de facto fiduciary relationship. The court grants defendants' motion on these two theories. However, plaintiffs have produced evidence sufficient to survive summary judgment on the de jure duty to inform an insured about the nature and extent of coverage. Defendants' motion will therefore be denied on this theory. Plaintiffs' motion for summary judgment on this claim is denied.

ii.    Constructive Fraud

To maintain a constructive fraud claim under North Carolina law, a plaintiff must show that he or she and "defendants were in a relation of trust and confidence . . . [which] led up to and surrounded the consummation of [a] transaction in which defendant is alleged to have taken advantage of his position . . . to the hurt of plaintiff." Barger v. McCoy Hillard & Parks, 346 N.C.

15

650, 666 (1997) (alteration in original). The defendant must also have "[sought] to benefit himself" in the transaction. Id. For the reasons stated above with respect to the breach of fiduciary duty claim, plaintiffs have brought forth sufficient evidence of a fiduciary relationship to survive summary judgment only with respect to the "limited duty" to correctly advise an insured about the nature and extent of coverage. Plaintiffs therefore meet the first element of this claim only under this theory.

The court has already concluded above that the question of proximate cause on plaintiffs' claims should be submitted to the jury. Summary judgment on the constructive fraud claim therefore depends on whether plaintiffs have produced evidence that Carroll sought to benefit himself in the parties' transaction.

Carroll testified at his deposition that he would receive greater commissions the more a policy was worth. (See Pls' App. SMF Ex. B (DE 41-2) ("Carroll Deposition") 97:20–98:22). Carroll denied that his commissions played any role in his decisions. (See id. 99:5–14). But viewing this admission in the light most favorable to plaintiffs under the summary judgment standard, see Anderson, 477 U.S. at 255, the court concludes that it raises a reasonable inference that Carroll sought to benefit himself by inflating policy values, which creates an issue of material fact on his motivations and intent. See, e.g., United States ex rel. Bunk v. Gov't Logistics N.V., 842 F.3d 261, 276–77 (4th Cir. 2016) (noting that summary judgment generally should not be awarded when intent is at issue); Morrison v. Nissan Co., Ltd., 601 F.2d 139, 141 (4th Cir. 1979) (to similar effect). Plaintiffs' claim for constructive fraud therefore survives defendants' motion, insofar as it rests upon an insurance agent's duty to advise on coverage and the alleged breach thereof. Defendants' motion accordingly is denied as to plaintiffs' constructive fraud claim on this

theory, but granted in all other respects concerning this claim. Plaintiffs' motion for summary judgment on this claim is denied.

### iii.    Negligence

Defendants argue that plaintiffs cannot establish any element of negligence except the existence of a duty. The court disagrees, and concludes that plaintiffs have produced sufficient evidence of each element to survive summary judgment and present this claim to a jury, but that issues of fact preclude entry of summary judgment for either side.

Under North Carolina law, negligence has three elements: 1) a legal duty owed by the defendant to the plaintiff; 2) a breach of that duty; and 3) injury proximately caused by the breach. Keith v. Health-Pro Home Care Servs., Inc., 381 N.C. 442, 450 (2022).

If an insurance agent undertakes to procure insurance for another, the law imposes a duty to use reasonable skill and care to procure such insurance, and will hold the agent liable to the insured for loss proximately caused by failure to do so. Wiles v. Mullinax, 267 N.C. 392, 395 (1966); White v. Consol. Planning, Inc., 166 N.C. App. 283, 301 (2004). The parties agree that Carroll undertook to procure insurance for Clemmons Farming, and therefore owed this duty. (See Defs' Br. Opp'n 3). The court has also concluded above that proximate cause, between Carroll's actions and any of the various damages plaintiffs allege, is a question for the jury. Finally, defendants argue that plaintiffs' claimed damages were not reasonably foreseeable. But this contention is essentially a proximate cause argument, which the jury should decide. (See Defs' Br. Opp'n 9–10).[6] See McNair v. Richardson, 244 N.C. 65, 67 (1956) ("foreseeability of injury is a requisite of proximate cause").

---

[6]        Defendants also argue that any damages suffered by plaintiffs Clemmons and Lauren B. Clemmons individually are unconnected to defendants' conduct as a matter of law, because defendant Carroll owed duties only to plaintiff Clemmons Farming, a business entity. (See Defs' Br. Opp'n 9). However, privity of contract is not necessary to establish a duty under North Carolina law. See Finley Forest Condo. Ass'n v. Perry, 163 N.C. App. 735,

Summary judgment on plaintiffs' negligence claim therefore revolves around whether Carroll breached his duty to Clemmons Farming. This issue is rife with factual issues. For example, the parties clash over whether Carroll's admitted failure to follow Silveus's internal review procedures was proper. Plaintiffs argue it was not; defendants claim it was, because Carroll filled out the WFRP in reliance on the advice of VanLandingham, a ProAg executive. (See Mem. Law Supp. Pls' Mot. Summ. J. (Pls' Br. Supp.) (DE 39) 6; Defs' Br. Opp'n 6). The parties also dispute numerous facts concerning what information Carroll should have submitted to ProAg, whether he did so, and whether, if not, Carroll or Clemmons was responsible. (See generally Pls' SMF ¶¶ 22–31; Resp. Pls' SMF ¶¶ 22–31).

Whether Carroll acted reasonably is therefore entangled with a cascade of disputed factual questions, but "negligence claims are rarely susceptible of summary adjudication, and should ordinarily be resolved by trial on the merits," in part because "it is for the jury to determine whether the applicable standard of care has been breached." Goodman v. Wenco Foods, Inc., 333 N.C. 1, 17, 27 (1992); see Taylor v. Walker, 320 N.C. 729, 734 (1987) ("[A]pplication of the prudent man test, or any other applicable standard of care, is generally for the jury."); Finley Forest Condo. Ass'n v. Perry, 163 N.C. App. 735, 739 (2004) ("[s]ummary judgment is rarely appropriate in a negligence action because ordinarily it is the duty of the jury to apply the standard of care of a reasonably prudent person").

---

739 (2004). To determine whether the law imposes a duty to act with reasonable care to not injure a third person, the court must balance six factors: 1) extent to which the transaction was intended to affect the other person; 2) foreseeability of harm to the third person; 3) degree of certainty that the third person suffered injury; 4) closeness of the connection between the conduct and the injury; 5) moral blame attached to the defendant's conduct; and 6) public policy of preventing future harm. Id. at 740. Balancing these factors is appropriate at summary judgment. See id. at 740–41. Clemmons and Lauren B. Clemmons were the sole officers and shareholders of Clemmons Farming, Carroll discussed WFRP extensively with Clemmons, and eventually the two men filled out the application together. (See Pls' SMF ¶¶ 1, 11–12, 20–23). The court determines that the first two factors therefore point strongly towards imposing a duty on Carroll to act with reasonable care towards Clemmons and Lauren B. Clemmons, and that no conclusion on the other factors is appropriate at this time, given the parties' disputes on proximate cause. The court therefore rejects defendants' arguments that Carroll owed no duties to Clemmons and Lauren B. Clemmons.

The court therefore concludes that neither party is entitled to judgment as a matter of law on plaintiffs' negligence claim, because numerous disputes of material fact surround proximate cause and breach of duty.

### iv. Respondeat Superior

Plaintiffs pleaded that Silveus should be vicariously liable as Carroll's principal if Carroll is ultimately found liable for breach of fiduciary duty or constructive fraud. (Compl. ¶¶ 87–92). Defendants concede that respondeat superior would be appropriate if a jury finds Carroll liable for either claim. (See Defs' Br. Supp. 15; Defs' Br. Opp'n 15). The court therefore grants plaintiffs' motion for summary judgment as to respondeat superior, and Silveus will be held vicariously liable as Carroll's principal if a jury finds Carroll liable for breach of fiduciary duty or constructive fraud at trial.

### v. Negligence against Silveus

Plaintiffs plead a negligence claim against Silveus. Defendants argue that this claim appears identical to plaintiffs' respondeat superior theory, but address it in their briefing anyway as a negligent supervision claim out of an abundance of caution. (See Defs' Br. Supp. 16–17). Plaintiffs do not address this claim in any of their briefing, so the court construes this claim as defendants do, and addresses it in the same way.

Negligent supervision under North Carolina law has four elements:

> (1) the specific negligent act on which the action is founded, which may, in some cases, but not generally, be such as to prove incompetency, but never can, of itself, provide notice to the master; (2) incompetency, by inherent unfitness or previous specific acts or negligence, from which incompetency may be inferred; (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in "oversight and supervision," or by proving general reputation of the servant for incompetency or negligence; and (4) that the injury complained of resulted from the incompetency proved.

19

<u>Walters v. Durham Lumber Co.</u>, 80 S.E. 49, 51 (N.C. 1913); <u>see also</u> <u>Medlin v. Bass</u>, 327 N.C. 587, 590–91 (1990).

Plaintiffs have produced no evidence that any of the above elements was met at the time Carroll obtained the policy in February 2017. Nor do plaintiffs make any argument to the contrary beyond conclusory statements in their complaint. The court will therefore grant defendants summary judgment on plaintiffs' claim for negligence against Silveus. Plaintiffs' motion is denied to the extent it seeks summary judgment on this claim.

vi.     Unfair and Deceptive Trade Practices ("UDTP")

Defendants argue that neither Carroll nor Silveus misrepresented the terms of any insurance policy, which defeats plaintiffs' UDTP claim. The court agrees.

Generally, a UDTP claim must meet three elements: 1) the defendant committed an unfair or deceptive act or practice 2) in or affecting commerce, which 3) proximately caused injury to the plaintiff. <u>E.g.</u>, <u>Gray</u>, 352 N.C. at 68; <u>D C Custom Freight, LLC v. Tammy A. Ross & Assocs., Inc.</u>, 273 N.C. App. 220, 227 (2020). In addition, a plaintiff pursuing a UDTP claim based on a misrepresentation must demonstrate reasonable reliance on the alleged misrepresentation. <u>Bumpers v. Cmty. Bank of N. Va.</u>, 367 N.C. 81, 88 (2013).

Plaintiffs rest their UDTP claim entirely upon an alleged violation of N.C.G.S. § 58-63-15(1). (Compl. ¶¶ 101–07). This statute prohibits a variety of insurance industry practices and declares that they constitute unfair and deceptive acts as a matter of law, for which a plaintiff may recover through N.C.G.S. § 75-1.1, which creates the private right of action for UDTP. <u>See</u> <u>id.</u> §§ 58-63-15(1), 75-1.1. Because this claim therefore revolves around § 58-63-15(1), the court reproduces this provision in its entirety:

> The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:

(1) Misrepresentations and False Advertising of Policy Contracts--Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon, or making any false or misleading statement as to the dividends or share or surplus previously paid on similar policies, or making any misleading representation or any misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates, or using any name or title of any policy or class of policies misrepresenting the true nature thereof, or making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance.

Id.

A violation of § 58-63-15(1) meets the first UDTP element as a matter of law. Pearce v. Am. Defender Life Ins. Co., 316 N.C. 461, 470 (1986).[7] Defendants make no argument on the second element, and the court has already concluded that proximate cause should be submitted to the jury. Whether this claim survives defendants' motion therefore depends on whether plaintiffs have established a genuine issue of material fact of a violation of § 58-63-15(1).

Plaintiffs' UDTP theory rests upon two alleged misrepresentations: Carroll's statements to Clemmons, and Carroll's statements to ProAg. The court addresses these issues in turn.

Much of § 58-63-15(1) prohibits conduct plainly unrelated to the facts of this case. The court therefore focuses on its first sentence, which forbids making any "estimate, illustration, circular, or statement" misrepresenting the terms of "any policy issued or to be issued or the benefits or advantages promised thereby[.]" Defendants first argue that "all" of the information placed in the application came from Clemmons, (see Defs' Br. Supp. 18), so that Carroll's use of this information in the application cannot qualify as a statement by Carroll at all, much less a misrepresentation. But Carroll's deposition testimony contradicts this argument. In his deposition,

---

[7]     When Pearce was decided, § 58-63-15 was codified under a different statutory section number, but did not differ in substance from its current form.

Carroll testifies that he advised Clemmons to accept the use of the specific figures which plaintiffs now contend were improper. (See Carroll Dep. 86:18–87:6). The court therefore rejects this argument.

But even assuming that Carroll's use of particular numbers in the application constituted a statement to Clemmons, defendants also argue that nothing contained in the application qualifies as a misrepresentation about a policy "issued or to be issued" because ProAg did issue a policy providing those numbers' coverage level. (See Pls' App. SMF Ex. J (DE 41-10) 1).

Indeed, the decisions interpreting § 58-63-15(1) have involved affirmative misrepresentations by an agent or insurer about a policy's coverage. For example, in Pearce the Supreme Court of North Carolina upheld a UDTP claim by the estate of an insured air force pilot against an insurer which affirmatively misrepresented his coverage in the event of his death during his air force duties. See Pearce, 316 N.C. at 463–465, 471–73. Similarly, in Tammy A. Ross & Assocs., Inc., the North Carolina Court of Appeals concluded that an agent's assurances to a third party that the insured had coverage for a particular event constituted a misrepresentation within the meaning of the statute. See Tammy A. Ross & Assocs., Inc., 273 N.C. App. at 229–30. Finally, FSI, Inc. v. Newson, No. COA13-222, 2013 WL 5947132 (N.C. Ct. App. Nov. 5, 2013) determined that an agent's affirmative misrepresentation to the insured that a policy covered a particular risk, when the policy written and provided to the agent clearly did not provide such coverage, satisfied § 58-63-15(1). See id. at *1–2, *4–6. In each case, the agent's representation about coverage differed from the terms of the policy. In contrast, plaintiffs present no evidence that the figures on the policy application, assuming these constitute representations by Carroll, differed in any way from the terms of the policy ProAg actually issued. The court therefore concludes that defendants

did not make any statement to Clemmons misrepresenting the terms of any policy issued or to be issued.

The court next turns to plaintiffs' argument that Carroll's submission of allegedly incorrect documents to ProAg in itself constituted a misrepresentation. (See Pls' Br. Supp. 13). This argument fails for the same reasons as plaintiffs' first UDTP argument: even assuming that figures included in an insurance application constitute representations by an agent, they are not misrepresentations if they align with the policy actually issued. Given that Carroll made these statements to ProAg, not Clemmons, this outcome also accords with statements in Jefferson-Pilot Life Ins. Co. v. Spencer, 336 N.C. 49 (1994), that § 58-63-15(1) is principally concerned with regulating insurance sales and protecting customers. See id. at 53.

Finally, although plaintiffs' UDTP briefing focuses solely on § 58-63-15(1), the court addresses a possible standalone § 75-1.1 claim out of an abundance of caution. A standalone § 75-1.1 claim must involve "egregious or aggravating circumstances[.]" Dalton v. Camp, 353 N.C. 647, 657 (2001) (emphasis in original); see Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998) ("North Carolina law requires a showing of substantial aggravating circumstances to support a claim under the UTPA [sic]"); Chapel H.O.M. Assocs., LLC v. RME Mgmt., LLC, 256 N.C. App. 625, 629 (2017) ("Our cases finding sufficient aggravating factors have generally involved forms of forgery or deception."); cf. Post v. Avita Drugs, LLC, 2017 NCBC 93, at *4–5 (N.C. Bus. Ct. 2017) (collecting numerous cases that met this standard, but which involved actual fraud, forgery, destruction of evidence, deliberate concealment of contractual breach, abuse of the corporate form, or other dramatic misconduct). Whether a plaintiff has presented evidence of egregious or aggravating circumstances is a question

of law for the court. Dalton, 353 N.C. at 656. Here, plaintiffs have not presented evidence meeting this standard. Thus, plaintiffs cannot sustain their UDTP claim on § 75-1.1 either.

In sum, plaintiffs cannot demonstrate a violation of § 58-63-15(1), or circumstances supporting a standalone § 75-1.1 claim. Plaintiffs cannot establish that defendants committed an unfair or deceptive act, and their UDTP claim therefore fails as a matter of law.

B.    Motion to Exclude Parker

1.    Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. Under Rule 702, expert testimony is appropriate when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. A witness qualified as an expert may be permitted to testify where "(b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Id.

Federal Rule of Evidence 702 imposes a "basic gatekeeping obligation" upon a trial judge to "ensure that any and all scientific testimony is not only relevant, but reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93 (1993). "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

"[R]elevance – or what has been called 'fit' – is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the 'the trier of fact to understand the evidence or to determine a fact in issue.'" United States v. Ancient Coin Collectors Guild, 899 F.3d 295, 318 (4th Cir. 2018). A key "aspect of relevancy . . . is whether

expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Daubert, 509 U.S. at 591.

The reliability inquiry is a "flexible one focusing on the principles and methodology employed by the expert, not on the conclusions reached." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). One factor pertinent to reliability is the proposed expert's qualifications. See Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989). A witness may qualify to render expert opinions in any one of the five ways listed in Rule 702: knowledge, skill, experience, training, or education. Kumho Tire, 526 U.S. at 147. When an expert's qualifications are challenged, "'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'" Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993).

In assessing whether expert testimony is "reliable," the court considers additional factors besides the expert's qualifications. These include:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the techniques' operation; and (5) whether the technique has received general acceptance within the relevant scientific or expert community.

United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003). These factors are "neither definitive, nor exhaustive," and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Cooper, 259 F.3d at 199–200. "[T]he court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful[,] . . . depend[ing] upon the unique circumstances of the expert testimony involved." Westberry, 178 F.3d at 261.

Of course, the admission of expert testimony must be considered within the context of the other rules of evidence. In particular, Rule 403 provides that the court must ensure that the

probative value of any proffered evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. As this court has noted, "[d]espite the court's ability to exercise broad discretion and flexibility when determining the admissibility of expert testimony, the court must balance this discretion with the concerns of Rule 403 to ensure that the probative value of the proffered testimony is not 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Bouygues Telecom, S.A. v. Tekelec, 472 F. Supp. 2d 722, 725 (E.D.N.C. 2007) (quoting Fed. R. Evid. 403).

        2.      Analysis

Parker is a former USDA official and current crop insurance consultant, developer, and agent. (See Defs' Mem. Supp. Mot. In Limine Exclude Opinions and Test. of Clifton R. Parker as Expert (DE 37) ("Br. Supp. Exclude") Ex. 1 (DE 37-1) 5 ("Parker Report")). Parker worked for the USDA for thirty years, over which time he held five different crop insurance-related positions. (Id. at 5). Since his retirement from the USDA in 2007, Parker has worked as a crop insurance consultant and licensed crop insurance agent. (Id.)

Defendants do not contend that Parker lacks qualifications, or pose any general objections to his testimony under Daubert or Rule 702. Instead, they move to exclude Parker as an expert on four specific grounds which, together, would exclude all of his testimony: 1) Parker's conclusions about price calculations are contradicted by his source and his own report, which renders them unreliable; 2) Parker's conclusions about yield are contradicted by his source; 3) Parker attempts to testify improperly about others' states of minds; and 4) Parker improperly attempts to offer legal

conclusions. The court agrees with the third contention in full and with the fourth in part, which renders a separate examination of the first or second unnecessary.

Defendants first contend that Parker improperly attempts to testify about the mental states of other people. In his report, Parker opines about assurances Carroll offered to Clemmons, that Clemmons believed Carroll, and that Clemmons relied on Carroll "in good faith[.]" (Parker Report 4). He later opines that Clemmons relied upon Carroll to make business decisions. (Id. 7).

However, a central requirement for expert testimony is that it "concerns . . . scientific, technical, or other specialized knowledge[.]" Fed. R. Evid. 702(a); e.g., Westberry, 178 F.3d at 260. Whether Carroll assured Clemmons of anything, whether Clemmons believed him, and what Clemmons relied upon do not involve any specialized knowledge that would assist a jury. The court further notes that this proposed testimony likely violates Rule 602, which requires personal knowledge of the subject of testimony, because Parker has no way to know what Clemmons believed about anything when he and Carroll interacted in 2017.[8] See Fed. R. Evid. 602. The court therefore agrees with defendants that these statements should be excluded. Parker will not be permitted to present the opinions contained in the last complete paragraph of page 8 of his report, the sentence on page 11 that Clemmons and CFFC "relied upon" Carroll to make their business decisions, or other testimony in his report about Clemmons's state of mind or beliefs, that Clemmons relied upon Carroll, or that Carroll made assertions.[9]

Next, defendants argue that Parker's opinions constitute legal conclusions, on a variety of grounds. Generally, an expert may not testify to a legal conclusion. E.g., United States v. Barile,

---

[8] Rule 602 contains an exception that permits an expert to testify about facts and data which he or she has not personally observed, but this exception is not relevant here. See Fed. R. Evid. 602; Fed. R. Evid. 703.

[9] In their briefing, the parties generally cite to the page numbers on the face of the report. To be clear, this sentence refers to pages 8 and 11 under the court's ECF filing system, which are numbered as pages 4 and 7 on the face of the report. The last complete paragraph on page 8 begins with "Mr. Carroll assured" and ends with "crop insurance and WFRP."

286 F.3d 749, 760 (4th Cir. 2002). However, experts generally <u>may</u> testify about specialized industries, including the standard of care and accepted practices in such fields. <u>See</u> <u>Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.</u>, 785 F.2d 1154, 1162 (4th Cir. 1986).

Courts routinely hold that insurance is a specialized industry on which expert testimony, including on generally accepted practices, is permissible. <u>See, e.g.</u>, <u>Peckham v. Cont'l Cas. Co.</u>, 895 F.2d 830, 837 (1st Cir. 1990); <u>SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC</u>, 467 F.3d 107, 133–3 (2d Cir. 2006); <u>United Prop. & Cas. Ins. v. Couture</u>, 639 F. Supp. 3d 590, 599 (D.S.C. 2022); <u>Carlisle v. Allianz Life Ins. Co. of N. Am.</u>, No. 2:19cv565, 2021 WL 8445825, at *6 (E.D. Va. Nov. 15, 2021); <u>Hopeman Bros., Inc. v. Cont'l Cas. Co.</u>, No. 4:16-cv-187, 2018 WL 4169282, at *14 (E.D. Va. Jan. 12, 2018); <u>see also</u> <u>Merrill v. McCarthy</u>, No. 7:14-CV-4-BR, 2016 WL 1258472, at *3 (E.D.N.C. Mar. 30, 2016) (noting in dicta that courts often permit experts to testify about insurance industry custom).

Nonetheless, an expert may not "construe[] a document for its legal effect" or testify to "the meaning and applicability" of pertinent law. <u>Adalman v. Baker, Watts & Co.</u>, 807 F.2d 359, 366–68 (4th Cir. 1986), <u>abrogated on other grounds</u>, 486 U.S. 622 (1988).

With these principles in mind, the court examines each of defendants' arguments in sequence.

First, defendants contend that insurance practices are known to the average layperson, such that expert assistance and interpretation is unnecessary.[10] (<u>See</u> Br. Supp. Exclude 8). Parker's qualifications demonstrate extensive experience in crop insurance. (<u>See</u> Parker Report 5). And he opines about the workings of the insurance industry and the reasonable responsibilities of

---

[10]     This argument, as defendants present it, does not appear to implicate impermissible legal conclusions. However, defendants include it in that section of their brief, and so the court examines it with defendants' other legal conclusion contentions.

insurance agents, specialized fields with which average laypersons would be unfamiliar. (See Parker Report 9, 10–11). The court therefore rejects defendants' argument that insurance is inherently so well-understood a field that a jury needs no expert assistance. E.g., Peckham, 895 F.2d at 837; Couture, 639 F. Supp. 3d at 599; (see Br. Supp. Exclude 8).

Defendants also argue that Parker's reliance on internal Silveus memos expressing concern over Carroll's compliance with company policy is improper because these memos issued in 2018, and do not state that Carroll's conduct in 2017 violated then-prevailing policies.[11] (Br. Supp. Exclude 8–9). However, this argument goes to credibility, not admissibility. These memos express general concern about Carroll's history and refer to his performance in 2017. (See Parker Report 10). The court therefore rejects this argument as well and concludes that Parker should be permitted to rely upon and reference these documents. To the extent that defendants believe these documents speak only weakly to Carroll's 2017 conduct, they are free to present such points through their own witnesses and through cross-examination. See, e.g., United States v. Baller, 519 F.2d 463, 466 (4th Cir. 1975).

Finally, defendants argue that Parker's opinions interpreting the handbook on an agent's duties, and on calculating future crop prices and yields, are legal conclusions. The court can resolve all three arguments on the same basis. On all three issues, Parker expresses some opinions that purport to interpret the WFRP handbook published by the USDA and the RMA, and others that do not. But he admits, and plaintiffs contend, that the USDA's supervision of crop insurance means that the handbook is binding on crop insurance policies. (See Pls' SMF ¶ 5; Parker Report 6; Defs' App. SMF Ex. 2A (DE 34-5) 2).

---

[11]      Like defendants' first argument, this point does not appear to implicate legal conclusions, but the court addresses it here for the same reasons.

Therefore, Parker's opinions that purport to interpret directly the requirements outlined in the handbook, and whether Carroll obeyed them, impermissibly "construe[] a document for its legal effect" and testify to "the meaning and applicability" of pertinent law. See Adalman, 807 F.2d at 366–68. But his opinions on industry custom, or other subjects that do not involve interpretation of the handbook, do not.

Parker construes the handbook directly in two ways. First, he interprets the handbook's requirements for calculating crop prices, and whether Carroll followed those procedures. (See Parker Report 7–8). Second, he does the same for calculating expected crop yields. (See id.). All these opinions interpret a legal instrument and decide how it applies, legally, to the facts of this case. For this point, defendants rely heavily upon Garey v. James S. Farrin, P.C., 514 F. Supp. 3d 784 (M.D.N.C. 2021). The court finds this case instructive. In Garey, the proposed expert attempted to interpret the terms of a statute, and applied its terms directly to the facts of the case. See id. at 790. Similarly, Parker here interprets the language of the handbook, and opines directly that Carroll violated its directives in various ways. Presenting such legal conclusions is impermissible. E.g., Adalman, 807 F.2d at 366.

Conversely, Parker also offers opinions that merely speak generally to a crop insurance agent's duties and related issues. (See Parker Report 9). These opinions do not present legal conclusions.

Between these two extremes, Parker also presents opinions on agent duties that suggest at least implicit interpretation of the handbook. (See Parker Report 9–10). This testimony may or may not be permissible, depending on the precise contours of a line of questioning and responses. The court therefore concludes that direct interpretation of the handbook is impermissible, testimony on the insurance industry and its customs should be permitted, and testimony that skirts

30

the boundary between these two categories, or that suggests implicit interpretation of the handbook, should first be presented through a proffer at trial, at which time the court will rule on admissibility of specific lines of testimony or questions.

In sum, Parker may not testify to what Carroll allegedly assured Clemmons, or about Clemmons's state of mind or thoughts. Nor may he testify about the legal effect and meaning of the handbook, and whether Carroll followed its directives. He may, however, testify about generally accepted practices and customs in the insurance industry, and about whether defendants adhered to those practices. Finally, testimony that relies upon or implicitly interprets the handbook should first be proffered at trial, at which time the court will rule on admissibility. Accordingly, defendants' motion to exclude is granted in part and denied in part.

C.      Motion to Seal

Defendants filed a motion to seal contemporaneously with their summary judgment motion (DE 44). The court denied this motion without prejudice on grounds that the document defendants wished to seal did not actually appear on the docket. (See Order (DE 53)). This order directed defendants to file the document in question, and to show cause why it should be sealed. Defendants timely filed the document.

In considering a request to seal, the court generally must first determine if the source of the public's right to access the documents is derived from the common law or the First Amendment. See Stone v. Univ. of Md., 855 F.2d 178, 180 (4th Cir. 1988). The common law presumption in favor of access attaches to all judicial records and documents, whereas First Amendment

protection is extended to only certain judicial records and documents, including, for example, those filed in connection with a summary judgment motion.  Id.

The First Amendment provides a qualified right of access to summary judgment briefs, which "may be abrogated only in unusual circumstances."  Doe v. Public Citizen, 749 F.3d 246, 266–67 (4th Cir. 2014).  When the First Amendment right of access applies, the moving party must show that sealing the entire brief is "necessitated by a compelling government interest."  Id. Furthermore, when presented with a motion to seal, the court must "1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; 2) consider less drastic alternatives to closure; and 3) if it determines that full access is not necessary, it must state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives."  Id. at 272 (citing In re Knight Pub. Co., 743 F.2d 231, 234–35 (4th Cir. 1984)); Stone, 855 F.2d at 180–81.

The exhibit defendants seek to seal contains sensitive information such as recent business information for internal consumption only, and internal evaluations of Silveus personnel.  (See generally Proposed Sealed Document (DE 54)).  Because the interests in sealing such information outweigh the First Amendment and common law interests in disclosure of the same in connection with the court's instant rulings, defendants' motion to seal (DE 55) is granted.  The court directs the clerk to maintain under seal DE 42 and 54.

## CONCLUSION

Based on the foregoing, plaintiffs' motion for summary judgment (DE 38) is GRANTED IN PART and DENIED IN PART as follows.  Plaintiff's motion is GRANTED insofar as it seeks to hold Silveus vicariously liable through respondeat superior in the event a jury finds Carroll liable for breach of fiduciary duty or constructive fraud; Plaintiffs' motion is otherwise DENIED.

Defendants' motion for summary judgment (DE 32) is GRANTED IN PART and DENIED IN PART as follows. Defendants' motion is GRANTED as to the following claims, which are DISMISSED WITH PREJUDICE:

1) Negligence against Silveus;

2) Breach of fiduciary duty against Carroll insofar as the claim rests upon an alleged violation of an implied duty to advise or a de facto fiduciary relationship;

3) Constructive fraud against Carroll insofar as it rests upon an alleged violation of an implied duty to advise or a de facto fiduciary relationship; and

4) Unfair and deceptive trade practices against Silveus and Carroll in violation of N.C.G.S. §§ 58-63-15(1) or 75-1.1.

Defendants' motion is DENIED as to the following claims, which shall proceed to trial:

1) Breach of fiduciary duty against Carroll insofar as it rests upon an alleged violation of the de jure fiduciary duty to advise an insured of the nature and extent of coverage;

2) Constructive fraud against Carroll insofar as it rests upon an alleged violation of the de jure fiduciary duty to advise an insured of the nature and extent of coverage;

3) Negligence against Carroll.

Defendants' motion to exclude Parker as an expert (DE 36) is GRANTED IN PART and DENIED IN PART as follows. Defendants' motion is GRANTED as to the following proposed testimony by Parker, which shall be excluded at trial:

1) Assurances Carroll offered to Clemmons;

2) Clemmons's state of mind or reliance on Carroll's statements;

3) Whether Carroll violated the WFRP handbook's guidelines on calculating expected crop prices and yields;

4) Whether Carroll violated the WFRP handbook's guidelines on the duties of a crop insurance agent.

Defendants' motion is DENIED as to the following proposed testimony by Parker, which shall be permitted at trial, subject to the other Federal Rules of Evidence and objections properly made thereunder:

1) Proposed testimony about the general customs, structure, accepted practices, and other areas of the insurance industry with which an average layperson would be unfamiliar;

2) Whether Carroll violated such customs and general practices.

Defendants motion to seal (DE 55) is GRANTED, and the clerk is DIRECTED to maintain under seal DE 42 and 54.

In accordance with the case management order entered September 15, 2021, as amended August 26, 2022, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and file within **14 days** from the date of this order a joint status report informing the court of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates. The parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such.

SO ORDERED, this the 26th day of January, 2024.

LOUISE W. FLANAGAN
United States District Judge

34